2007 ND 26

**STOCKMAN BANK OF MONTANA, a Montana banking corporation, Plaintiff and Appellant,**

v.

**AGSCO, INC., a North Dakota corporation, Capital Harvest, Inc., d/b/a Capital Harvest Finance Company, a North Dakota corporation, individually and as agent for AGSCO, Inc., Defendants and Appellees,**

and

**Farmers Union Oil Company of Williston, a North Dakota cooperative association, MON–KOTA, Inc., a Montana corporation, Betaseed, Inc., a Minnesota corporation, Central Insurance Agency, a North Dakota corpora-**tion, Steven D. Cayko, a/k/a Steve Cayko, Perry Elletson, a/k/a Perry E. Elletson, Ron Gross, a/k/a Ronnie Gross, Edward P. Ochs, a/k/a Eddie Ochs, Tom Ochs, Mark Brunelle, Kelly Brunelle, and Bill Sheldon, Defendants,

and

**Farmers Union Oil Company of Williston, a North Dakota cooperative association, Third-party Plaintiff,**

v.

**Hardy Farm, Inc., and Jim Hardy, Third-party Defendants.**

No. 20060174.

Supreme Court of North Dakota.

Feb. 28, 2007.

Rehearing Denied March 26, 2007.

Garth H. Sjue (argued) and Ken G. Hedge (on brief), Crowley, Haughey, Hanson, Toole & Dietrich, P.L.L.P., Williston, ND, for plaintiff and appellant.

John S. Foster (argued) and Tracy Ann Kennedy (appeared), Zimney Foster P.C., Grand Forks, ND, for defendants and appellees.

VANDE WALLE, Chief Justice.

[¶ 1] Stockman Bank of Montana appealed from a summary judgment determining AGSCO, Inc., and Capital Harvest, Inc., were entitled to agricultural supplier's liens for agricultural supplies furnished to Hardy Farm, Inc. We affirm in part, reverse in part, and remand for proceedings consistent with this opinion.

I

[¶ 2] Stockman Bank is a Montana banking corporation with a branch office in Sidney, Montana. Stockman Bank provided operating loans for the 2001 and 2002 crop years for Hardy Farm, which conducted farming operations in North Dako-

ta and Montana during those years. According to Hardy Farm's records, in 2002 Hardy Farm planted 1,587 acres of sugar beets and 207 acres of grain in Montana, and 1,564 acres of sugar beets and 2,447 acres of grain in North Dakota. In January 2002, Hardy Farm executed a promissory note to Stockman Bank for $4,991,039. In August 2002, Stockman Bank advanced Hardy Farm an additional $356,979 to complete the 2002 crop. As security for Stockman Bank's loans, Hardy Farm executed security agreements granting Stockman Bank a security interest in Hardy Farm's then-owned or thereafter acquired property, including its crops, and Stockman Bank filed financing statements for the security agreements.

[¶ 3] AGSCO is a North Dakota corporation that sells agricultural chemicals and supplies to farmers in North Dakota and Montana. AGSCO offers its customers a one percent discount if their bill is paid within five days of the invoice; otherwise, the invoiced amount is due within thirty days of the date of the invoice. AGSCO also offers its customers a credit line through Capital Harvest, an affiliate North Dakota corporation. Both AGSCO and Capital Harvest are owned by Randy Brown. Capital Harvest does not sell agricultural goods or furnish agricultural services; rather, Capital Harvest finances AGSCO's credit sales under a revolving charge agreement. AGSCO and Capital Harvest had an "agency agreement" for Capital Harvest, as agent for and affiliate of AGSCO, in which Capital Harvest agreed to facilitate financing and credit applications for AGSCO's customers; to establish appropriate lines of credit for AGSCO's customers' purchase of AGSCO products; to perform all services necessary to bill and invoice AGSCO's customers for products purchased from AGSCO and collect balances due; to market AGSCO's products; to finance purchases of AGSCO's products and services on a non-recourse basis; and to indemnify and hold AGSCO harmless for any damages, injury, or loss caused by Capital Harvest's performance of its responsibilities under the agency agreement.

[¶ 4] In March 2002, Capital Harvest provided Hardy Farm with a $500,000 credit line for the purchase of agricultural chemicals and supplies from AGSCO. The credit line provided that if the balance on the account was not paid by December 1, 2002, Hardy Farm would be responsible for all credit service charges at the fixed rate of 18 percent per annum, but if the balance was paid before December 1, 2002, the 18 percent rate would be waived in an amount necessary to bring the annual effective interest rate "to Wall Street Journal Prime minus 3.0% floating daily, (currently 1.75% per annum)." During the 2002 growing season, AGSCO sold Hardy Farm $536,582.24 in agricultural chemicals and services. AGSCO transferred $500,000 of Hardy Farm's account receivables to Capital Harvest under the revolving charge agreement. Rick Dregseth, the chief financial officer of an affiliate of AGSCO and Capital Harvest, described the recordkeeping for the transfer of the account receivables to Capital Harvest:

2.

That AGSCO sells agricultural products to a Customer on credit, which creates a receivable from that Customer on AGSCO's books.

3.

That the next business day after the purchase is made, AGSCO transfers its Customer receivable to Capital Harvest for collection. Capital Harvest pays nothing to AGSCO for this bookkeeping transfer of the Customer receivable between the two affiliated entities.

**4.**

That the transfer shows as a bookkeeping receivable to AGSCO from Capital Harvest.

**5.**

That Capital Harvest then creates a bookkeeping receivable from the Customer for the amount of the products purchased plus any finance charge required of the Customer in the Revolving Charge Agreement.

**6.**

That AGSCO does not receive cash or payment in any form from Capital Harvest for the amount of the sale, for the transfer of the receivable from AGSCO's books to Capital Harvest's books, or at anytime thereafter until the Customer pays Capital Harvest. Capital Harvest does not maintain lending capital of its own to buy AGSCO's receivables and never pays AGSCO for any receivables until payment is collected from the Customer.

**7.**

That when Capital Harvest collects money from the Customer it credits its bookkeeping receivable, which in turn allows Capital Harvest to pay money to AGSCO as a credit on its bookkeeping receivable to AGSCO.

**8.**

That AGSCO holds an outstanding receivable on its books and does not get paid unless and until Capital Harvest's receivable is satisfied with payment in money from the Customer.

[¶ 5] According to Marc Geatz, the credit manager for AGSCO and Capital Harvest, they sold Hardy Farm $536,582.24 worth of agricultural chemicals and services during the 2002 growing season, and in May 2003, Hardy Farm owed $552,330.41 for those purchases. On October 30, 2002, AGSCO filed an agricultural supplier's lien with the North Dakota Secretary of State, which said $35,142.61 was owed for the purchase of agricultural chemicals for Hardy Farm's alfalfa, corn, malting barley, potatoes, sugar beets, and wheat crops located in Township 151, Range 104 and Township 152, Range 104 in McKenzie County, North Dakota. On October 30, 2002, Capital Harvest, "as Agent for AGSCO," also filed an agricultural supplier's lien with the North Dakota Secretary of State, which said $500,000 was owed for the purchase of agricultural chemicals for Hardy Farm's alfalfa, corn, barley, wheat, potatoes, and sugar beet crops located on the same land in McKenzie County. AGSCO and Capital Harvest also filed crop liens for spraying or dusting in Montana under Mont.Code Ann. § 71-3-902 (2005).

[¶ 6] In 2003, Stockman Bank sued several entities with claimed interests in Hardy Farm's crops, alleging Stockman Bank had a perfected security interest in the proceeds from Hardy Farm's crops. Stockman Bank sought to determine the respective rights of the parties to several checks deposited with the district court, which represented the proceeds from the crops. Stockman Bank alleged Capital Harvest was not entitled to an agricultural supplier's lien, because Capital Harvest had not provided agricultural supplies to Hardy Farm and did not have a perfected security interest that was prior to Stockman Bank's security interest. Stockman Bank asserted the amount claimed as a lien by AGSCO and by Capital Harvest was excessive in light of the number of acres farmed by Hardy Farm in North Dakota.

[¶ 7] In March 2004, the district court granted partial summary judgment for AGSCO and Capital Harvest, concluding AGSCO and Capital Harvest clearly intended an agency relationship for the furnishing of agricultural supplies to Hardy Farm, and Capital Harvest was acting as an agent of AGSCO and was entitled to file an agricultural supplier's lien on AGSCO's behalf; under North Dakota law, AGSCO and Capital Harvest complied with the statutory requirements for an agricultural supplier's lien and were entitled to an agricultural supplier's lien for agricultural supplies provided to Hardy Farm within a 120–day window before their liens were filed on October 30, 2002; and Capital Harvest was not entitled to a lien for aerial spraying done by an independent third party. The court decided additional facts were necessary to determine what agricultural supplies were furnished to Hardy Farm "within the 120–day period and on produce from North Dakota lands."

[¶ 8] In January 2006, the district court granted a final summary judgment for AGSCO and Capital Harvest, concluding as a matter of law they were entitled to an agricultural supplier's lien of $176,560.85 for agricultural supplies furnished to Hardy Farm after July 2, 2002, plus accrued finance charges of $74,024.84 through November 30, 2004, and finance charges of $87.07 per day after November 30, 2004. In January 2006, a judgment was entered authorizing Capital Harvest and AGSCO to obtain $250,585.69, plus $87.07 per day finance charges after November 30, 2004, from the funds deposited with the district court. In January 2006, at the request of counsel for AGSCO and Capital Harvest, the clerk of court released that amount to AGSCO and Capital Harvest. Stockman Bank thereafter moved under N.D.R.Civ.P. 62(a) to compel return of the funds to the district court and to stay the judgment. Stockman Bank also moved to alter or amend the judgment, or for relief from the judgment. The court denied Stockman Bank's motions.

II

[¶ 9] We consider the issues raised in this appeal in the posture of summary judgment, which is a procedural device for the prompt resolution of a controversy on the merits without a trial if there are no genuine issues of material fact or inferences that reasonably can be drawn from the undisputed facts, or if the only issues to be decided are questions of law. *Johnson v. Nodak Mut. Ins. Co.*, 2005 ND 112, ¶ 9, 699 N.W.2d 45. A party moving for summary judgment must show there are no genuine issues of material fact and the case is appropriate for judgment as a matter of law. *Green v. Mid Dakota Clinic*, 2004 ND 12, ¶ 5, 673 N.W.2d 257. A party resisting a motion for summary judgment cannot merely rely on the pleadings or an unsupported conclusory allegations. *Beckler v. Bismarck Pub. Sch. Dist.*, 2006 ND 58, ¶ 7, 711 N.W.2d 172. A party resisting a motion for summary judgment must present competent admissible evidence by affidavit or other comparable means that raises an issue of material fact and must, if appropriate, draw the court's attention to relevant evidence in the record by setting out the page and line in depositions or other comparable documents containing testimony or evidence raising an issue of material fact. *Id.* When reasonable persons can draw but one conclusion from the evidence, a question of fact becomes a matter of law for the court to decide. *Bernabucci v. Huber*, 2006 ND 71, ¶ 21, 712 N.W.2d 323. On appeal, we view the evidence in the light most favorable to the party opposing the summary judgment, and that party must be given the benefit of all favorable

inferences. *Hurt v. Freeland,* 1999 ND 12, ¶ 7, 589 N.W.2d 551. Whether a district court properly granted summary judgment is a question of law that we review de novo on the entire record. *Johnson,* at ¶ 9.

### III

[¶ 10] Stockman Bank argues AGSCO and Capital Harvest are separate corporations with separate financial records and the district court erred in deciding an agency relationship existed between AGSCO and its corporate affiliate, Capital Harvest, which provided a basis for Capital Harvest's agricultural supplier's lien. Stockman Bank asserts the undisputed evidence establishes that because of the structure of payments under Capital Harvest's credit line with Hardy Farm and because Capital Harvest bore the risk of loss for nonpayment by Hardy Farm, each party was acting in its own right and for its own benefit in filing a lien on Hardy Farm's crop proceeds. Stockman Bank alternatively asserts there are disputed issues of fact about whether AGSCO and Capital Harvest have an agency relationship.

[¶ 11] An agency relationship results when one entity, called the principal, authorizes another entity, called the agent, to act for the principal in dealing with third parties. N.D.C.C. § 3–01–01. An agency is either actual or ostensible and is actual when the agent really is employed by the principal. N.D.C.C. § 3–01–03. Any person having capacity to contract may appoint an agent and any person may be an agent. N.D.C.C. § 3–01–04. An agent has the actual authority that the principal intentionally confers upon the agent, and an agent may do any acts the principal may do. N.D.C.C. §§ 3–01–05, 3–02–01, and 3–02–02. An agent has authority to do everything necessary or proper and usual in the ordinary course of

business to effect the purpose of the agency. N.D.C.C. § 3–02–08(1). Agency is generally a question of fact. *Red River Commodities, Inc. v. Eidsness,* 459 N.W.2d 805, 810 (N.D.1990). Agency is never presumed, and if an agency relationship is denied, the party alleging agency must establish it by clear and convincing evidence. *Argabright v. Rodgers,* 2003 ND 59, ¶ 6, 659 N.W.2d 369.

[¶ 12] We conclude this record establishes an actual agency relationship between AGSCO and Capital Harvest as a matter of law. Randy Brown is the sole owner of both AGSCO and Capital Harvest. According to Brown, he created Capital Harvest in 1999 to enable AGSCO's customers to purchase agricultural supplies and products from AGSCO on credit. In an affidavit, Brown stated that Capital Harvest provides AGSCO with credit investigations on customers, establishes maximum credit purchase limits for customers, provides customers with revolving charge account agreements so customers can charge agricultural supplies sold by AGSCO, and provides the expertise necessary to collect the accounts from customers who purchase AGSCO products on credit. According to Brown, he eventually intended to expand Capital Harvest's role from merely a product financing arm of AGSCO to a money-lending entity, but Capital Harvest had not yet functioned as a money-lending entity.

[¶ 13] An "agency agreement" between AGSCO and Capital Harvest explicitly gave Capital Harvest the exclusive right on behalf of AGSCO to provide financing and credit arrangements for farm customers who purchase agricultural products from AGSCO. The agency agreement authorized Capital Harvest to establish appropriate credit lines for approved customers, to facilitate the customers' purchase of agricultural supplies and services available

from AGSCO, and to perform all services necessary to properly invoice farm customers for products and services and collect balances due from customers. The agency agreement specified that all financing and credit arrangements made by Capital Harvest with AGSCO's customers were without recourse against AGSCO and that Capital Harvest assumed all collection responsibilities. The agency agreement required Capital Harvest to receive all credit and financing applications from AGSCO's customers, to perform evaluations for credit worthiness, and to approve or disapprove applications in the exercise of reasonable and prudent credit and financing business practices.

[¶ 14] The revolving charge agreement between Hardy Farm and Capital Harvest specifically identified Capital Harvest as an affiliate of, and agent for, AGSCO and indicated the agreement was intended to enable Hardy Farm to make credit purchases of agricultural supplies from AGSCO. The revolving charge agreement provided that upon default by Hardy Farm, Capital Harvest was authorized to exercise the remedies available to agricultural supplier and input creditors. Capital Harvest's approval letter to Hardy Farm for the $500,000 credit line specifically stated "Capital Harvest, acting as agent for the supplier, reserves the right to protect its interest by recording an agricultural input lien allowed by state law. This lien, if any, does not require your consent and it arises by operation of law."

[¶ 15] We conclude Brown's affidavit, the agency agreement, and the other documentary evidence regarding Capital Harvest's affiliation with AGSCO, when considered and read together, lead to but one conclusion that Capital Harvest was an actual agent of AGSCO for purposes of collecting AGSCO's account receivables and had authority to file an agricultural supplier's lien as an agent for AGSCO. On this record, we conclude the district court did not err in deciding as a matter of law that an agency relationship existed between AGSCO and Capital Harvest for purposes of filing an agricultural supplier's lien.

IV

[¶ 16] Stockman Bank argues the district court erred in deciding Capital Harvest's credit line with Hardy Farm entitled Capital Harvest to the priority accorded an agricultural supplier's lien under N.D.C.C. ch. 35-31. Stockman Bank asserts the legislative history of N.D.C.C. § 35-31-01 evidences an intent to prevent the super priority status of agricultural supplier's liens for line of credit transactions like that used by Capital Harvest in this case. AGSCO and Capital Harvest respond the plain language of N.D.C.C. § 35-31-01 prohibits the super priority status for loans or advances and neither AGSCO nor Capital Harvest loaned or advanced money to Hardy Farm.

[¶ 17] Section 35-31-01, N.D.C.C., entitles any person who furnishes supplies used in the production of crops to an agricultural supplier's lien on the crops, and the lien has priority under N.D.C.C. § 35-31-03 over all other liens except an agricultural processor's lien filed under N.D.C.C. ch. 35-30. As used in N.D.C.C. ch. 35-31, "supplies" include fertilizer, farm chemicals, insecticides, or the furnishing of services in delivering or applying those supplies. N.D.C.C. § 35-31-01. Under N.D.C.C. § 35-31-01, "[a]n agricultural supplier's lien filed as a security interest created by contract to secure money advanced or loaned for any purposes is not effective to secure a priority over [crop] liens filed under [NDCC § ] 35-05-01."

[¶ 18] Words in a statute are given their plain, ordinary, and commonly

understood meaning, unless defined by statute or unless a contrary intention plainly appears. N.D.C.C. § 1–02–02. Statutes are construed as a whole and are harmonized to give meaning to related provisions. N.D.C.C. § 1–02–07. If the language of a statute is clear and unambiguous, the letter of the statute cannot be disregarded under the pretext of pursing its spirit. N.D.C.C. § 1–02–05. If the language of a statute is ambiguous or doubtful in meaning, a court may consider extrinsic aids, including legislative history, to determine legislative intent. N.D.C.C. § 1–02–39. A statute is ambiguous if it is susceptible to different, rational meanings. *Amerada Hess Corp. v. State ex rel. Tax Comm'r*, 2005 ND 155, ¶ 12, 704 N.W.2d 8. Our statutory lien laws are remedial and will be liberally construed to effectuate their purpose of protecting those who contribute labor, skill, or materials. *Stockman Bank v. AGSCO*, 2007 ND 27, ¶ 15, 727 N.W.2d 742; *North Dakota Mineral Interests, Inc. v. Berger*, 509 N.W.2d 251, 255 (N.D.1993). Statutory interpretation is a question of law, fully reviewable on appeal. *GO Comm. ex rel. Hale v. City of Minot*, 2005 ND 136, ¶ 9, 701 N.W.2d 865.

[¶ 19] The plain language of N.D.C.C. § 35–31–01 prohibits the super priority status of an agricultural supplier's lien for security interests created by "contract to secure money advanced or loaned." It is undisputed that AGSCO provided agricultural supplies to Hardy Farm. We have also held as a matter of law that Capital Harvest was an agent of AGSCO for purposes of filing an agricultural supplier's lien and approving Hardy Farm for credit purchases from AGSCO under a revolving charge agreement. According to Randy Brown, the sole owner of both AGSCO and Capital Harvest, neither entity functioned as a money-lending entity and their customers never received money or loan proceeds from either entity. The revolving charge agreement between Hardy Farm and Capital Harvest specifically identified Capital Harvest as an agent for AGSCO and said the agreement was intended to enable Hardy Farm to make credit purchases of agricultural supplies from AGSCO. Stockman Bank has presented no evidence that Capital Harvest or AGSCO actually loaned or advanced any money to Hardy Farm. A party resisting a motion for summary judgment must present competent admissible evidence by affidavit or other comparable means that raises an issue of material fact. *Beckler*, 2006 ND 58, ¶ 7, 711 N.W.2d 172. Nor do we believe the delayed maturity date in this case changes the credit purchases into a loan or advance. On this record, we conclude the structure of the relationship between Capital Harvest and AGSCO and their transactions with Hardy Farm were not for "money advanced or loaned" under the plain language of N.D.C.C. § 35–31–01 and do not defeat the priority status for Capital Harvest's agricultural supplier's lien.

V

[¶ 20] Stockman Bank argues the district court erred in deciding AGSCO and Capital Harvest were entitled to a lien because the underlying debt for the lien was not due until December 1, 2002, approximately one month after the liens were filed on October 30, 2002. Stockman Bank claims "[n]o lien arises by operation of law until the time at which the act secured by the lien is to be performed" under N.D.C.C. § 35–01–04, and therefore the liens filed by Capital Harvest and AGSCO were premature and ineffective.

[¶ 21] When read together, N.D.C.C. §§ 35–31–01 and 35–31–02 require an agricultural supplier's lien to be filed within 120 days after agricultural supplies are

furnished and provide the lien is effective from the date the supplies are furnished. Here, Hardy Farm signed a revolving charge agreement with Capital Harvest, as an agent for AGSCO, through which, in return for deferring payments otherwise due on the date of sale, Hardy Farm agreed to pay a finance charge. The transaction between Hardy Farm and AGSCO was a credit sale, and under these circumstances, we agree with AGSCO and Capital Harvest that December 1, 2002, does not constitute the "due date" for Hardy Farm's indebtedness. On this record, we conclude the agricultural supplier's liens filed by AGSCO and Capital Harvest were not premature.

## VI

[¶ 22] Stockman Bank argues the district court erred in deciding AGSCO and Capital Harvest met the statutory requirements for an agricultural supplier's lien. Stockman Bank argues AGSCO and Capital Harvest failed to substantially comply with the statutory procedure for obtaining an agricultural supplier's lien under N.D.C.C. § 35–31–02, which provides:

To obtain an agricultural supplier's lien, except an agricultural supplier's lien for furnishing petroleum products, the person entitled to the lien, within one hundred twenty days after the supplies are furnished or the services performed, shall file a verified statement in the office of the recorder of any county in this state or in the office of the secretary of state.... The statement must contain the following information:

1. The name and address of the person to whom the supplies were furnished.

2. The name and address of the supplier.

3. A description of the crops, agricultural products, or livestock and their amount or number, if known, subject to the lien together with a reasonable description, including the county as to the location of the crops, agricultural products, or livestock and the year the crop is to be harvested or was harvested.

4. A description and value of the supplies and the first date furnished.

5. The social security number or, in the case of a debtor doing business other than as an individual, the internal revenue service taxpayer identification number of the person to whom the supplies were furnished.

. . . .

[¶ 23] An agricultural supplier's lien cannot be obtained or enforced unless there has been substantial compliance with the statute. *Agricultural Bond & Credit Corp. v. Courtenay Farmers' Co-op. Ass'n,* 64 N.D. 253, 264, 251 N.W. 881, 887 (1933); *Huether v. McCaull–Dinsmore Co.,* 52 N.D. 721, 732, 204 N.W. 614, 617 (1925); *Chaffee v. Edinger,* 29 N.D. 537, 541, 151 N.W. 223, 224 (1915); *Lavin v. Bradley,* 1 N.D. 291, 296, 47 N.W. 384, 385 (1890). *See* 51 Am.Jur.2d *Liens* § 56 (2002) (stating some courts require strict compliance with statute while other courts hold that substantial compliance is sufficient).

[¶ 24] Stockman Bank argues Capital Harvest's lien does not provide the name of the supplier as required by N.D.C.C. § 35–31–02(2); instead, the lien lists Capital Harvest "as Agent for AGSCO." However, we have concluded as a matter of law that Capital Harvest was an agent for AGSCO for purposes of filing an agricultural supplier's lien, and we reject Stockman Bank's claim that the designation in the filed statement was not substantial compliance with N.D.C.C. § 35–31–02(2).

[¶ 25] Stockman Bank argues both liens were deficient in the description of the supplies sold under N.D.C.C. § 35-31-02(4), because the filed statements both claim a lien for "agricultural chemicals." However, N.D.C.C. § 35-31-01 specifically defines "supplies" to include "farm chemicals," and we conclude the description of supplies as "agricultural chemicals" substantially complies with the requirements of N.D.C.C. § 35-31-02(4).

[¶ 26] Stockman Bank argues both liens fail to give the date the supplies were first provided. Stockman Bank claims it is clear most of the supplies sold to Hardy Farm were sold before July 2, 2002, which was 120 days before the liens were filed on October 30, 2002. Although the lien claimants may not have a valid lien for supplies furnished before July 2, 2002, an issue we discuss later, on their face, the filed statements sufficiently describe the date the supplies were furnished and substantially complied with N.D.C.C. § 35-31-02(4).

[¶ 27] Stockman Bank asserts the liens are deficient in the location and description and quantity of the crops, because the filed statements claimed a lien on all alfalfa, corn, barley, wheat, potatoes, and sugar beets grown on "Township 151, Range 104; Township 152, Range 104 located in McKenzie County, ND."

[¶ 28] Section 35-31-02(3), N.D.C.C., requires the filed statement to contain a description of the crops and their amount or number, if known, subject to the lien together with a reasonable description, including the county, as to the location of the crops. Contrary to Stockman Bank's claim, the statute does not require a description of acreage or amount of crops. Rather, the statute specifically requires a description of the "amount or number, if known." Moreover, the statute requires a "reasonable description, including the county as to the location of the crops."

We conclude the filed statements substantially complied with the requirements of N.D.C.C. § 35-31-02(3) to provide a description of the amount or number of crops, if known, and a reasonable description of the location of the crops.

## VII

[¶ 29] Stockman Bank argues AGSCO and Capital Harvest were not entitled to an agricultural supplier's lien for services performed by an independent third party in the aerial application of chemicals by Craig Mehling, doing business as Craig Mehling Spraying Service. Stockman Bank claims the liens included $26,234.50 for aerial spraying services performed by Mehling and must be reduced by that amount.

[¶ 30] Section 35-31-01, N.D.C.C., defines "supplies" to include "farm chemicals . . . or the furnishing of services in delivering or applying the supplies." Here, AGSCO and Capital Harvest presented affidavit testimony indicating that AGSCO's contracted aerial sprayer was Craig Mehling Spraying Service, and Craig Mehling operated as an agent for AGSCO. Greg Breuer, an AGSCO salesman, stated:

AGSCO's contracted aerial applicator is Craig Mehling Spraying Service of Hardin, Montana, and that aerial service is an agent of AGSCO. We employ that aerial applicator to furnish our customers with chemicals which must be, or which are desired to be, applied by aerial application, unless the customer wants to use a different aerial applicator of its own choosing. After our aerial applicator sprays a particular field, he notifies me of that fact and I then enter the data into the AGSCO systems so that the customer can be billed for the application of the chemical by our contracted aerial applicator. Our aerial applicator bills AGSCO for his services and we pay

him directly pursuant to our agency agreement.

[¶ 31] According to Marc Geatz, the credit manager for AGSCO and for Capital Harvest:

AGSCO has its own contracted aerial applicator, Craig Mehling Spraying Service of Hardin, Montana. When a farm customer buys products which he wants aerially applied to his fields, he is certainly free to choose his own aerial applicator, but AGSCO does provide its own contracted applicator to apply the products if the customer wants us to apply them. Accordingly, we bill the farmer for both the product and the aerial application service accomplished by our agent Craig Mehling Spraying Service.

[¶ 32] According to Craig Mehling:

3.

In 2002 I had a verbal contract with AGSCO, Inc., to apply agricultural chemicals to the fields of AGSCO's customers.

4.

In 2002 I applied AGSCO, Inc.'s chemicals to the Hardy Farm, Inc., crops as an agent of AGSCO, Inc.

5.

AGSCO, Inc. paid me for my services and then billed its customer, (in this case Hardy Farm). I did not bill Hardy Farm, Inc., for my services nor was I paid by Hardy Farm Inc.

[¶ 33] Although Stockman Bank claims those statements are self-serving and not supported by any facts, Stockman Bank has not presented any contrary evidence by affidavit or otherwise, raising a disputed issue of material fact about Mehling's agency relationship with AGSCO. A party resisting a motion for summary judgment must present competent admissible evidence by affidavit or other comparable means that raises an issue of material fact and must, if appropriate, draw the court's attention to relevant evidence in the record by setting out the page and line in depositions or other comparable documents containing testimony or evidence raising an issue of material fact. *Beckler*, 2006 ND 58, ¶ 7, 711 N.W.2d 172. We conclude the district court did not err in deciding AGSCO and Capital Harvest were entitled to a lien for the aerial spraying by Mehling.

VIII

[¶ 34] Stockman Bank argues AGSCO and Capital Harvest were not entitled to an agricultural supplier's lien for sales occurring more than 120 days before the lien was filed. Stockman Bank argues any lien is limited to supplies delivered to Hardy Farm from July 2, 2002, to the date the lien was filed on October 30, 2002, which represents the 120–day window in N.D.C.C. § 35–31–02. Stockman Bank argues the district court properly recognized the 120–day window, but erred in applying that limitation to the facts of this case. Relying on an affidavit of Greg Breuer, an AGSCO salesman, Stockman Bank claims only about $59,110.04 in agricultural supplies were delivered or furnished to Hardy Farm within 120 days of the filing of the agricultural supplier's liens. Stockman Bank also claims the district court erred in failing to prorate the agricultural supplier's liens between chemicals applied to Montana crops and chemicals applied to North Dakota crops and in allowing AGSCO and Capital Harvest a double recovery for chemicals supplied to Montana crops. AGSCO and Capital Harvest respond that Breuer testified by affidavit that AGSCO furnished $176,560.85 worth of agricultural chemicals and related services to Hardy Farm during the 120–day

window from July 2, 2002, to October 30, 2002. AGSCO and Capital Harvest also claim proration of the agricultural supplier's lien between Montana and North Dakota is inappropriate, because the lien is not limited to an amount representing AGSCO products applied to crops in North Dakota. AGSCO and Capital Harvest argue that N.D.C.C. § 35–31–01 authorizes an agricultural supplier to take a lien on all of a producer's crops, regardless of whether or where the producer applied the chemicals to the crops.

[¶ 35] Section 35–31–01, N.D.C.C., explicitly authorizes any person who "furnishes" supplies used in the production of crops to a lien upon the crops. To obtain the lien, "the person entitled to the lien, within one hundred twenty days after the supplies are furnished or the services performed, shall file a verified statement in the office of the recorder of any county in this state or in the office of the secretary of state." N.D.C.C. § 35–31–02. The procedure for obtaining an agricultural supplier's lien explicitly requires filing the verified statement in the office of the recorder of any county "in this state or in the office of the secretary of state." N.D.C.C. § 35–31–02. We construe that language to apply to liens on crops "in this state." Our interpretation of N.D.C.C. ch. 35–31 precludes a double recovery for agricultural chemicals applied to crops in Montana and is supported by N.D.C.C. § 35–01–29, which provides that upon default of a debt secured by a statutory lien on personal property, the lien may be foreclosed by action under N.D.C.C. ch. 32–20. Section 32–20–07, N.D.C.C., provides that in all cases of foreclosure of chattel liens of any kind, foreclosure will be ordered only upon proof that the property or some part thereof is in existence, subject to execution, and within the jurisdiction of the court. We conclude that procedure, coupled with the "in this state" language of

N.D.C.C. § 35–31–02, contemplates liens on crops grown "in this state."

[¶ 36] We construe our agricultural supplier's lien statutes to provide an agricultural supplier's lien if the agricultural supplies were furnished to the producer within 120 days before the lien was filed and if the supplies were applied to crops in North Dakota. This record reflects proceedings in a Montana trial court under Montana law involving fertilizer and pesticide liens on the crops grown in Montana, in which the parties stipulated "as to the amount of the chemical sold by AGSCO, Inc. to Hardy Farm, Inc. and applied to crops in the State of Montana in 2002." *See* Mont.Code Ann. § 71–3–901 (2005) ("A person, firm, corporation, or partnership that under contract, express or implied, performs labor or services or furnishes material in crop dusting or spraying grains or crops, whether by aerial or ground application, for the purpose of fertilization or weed, disease, or insect control for promoting the growth of the grains or crops has a lien upon all grains or crops dusted or sprayed for and on account of the labor or service performed and material furnished, upon complying with the provisions of this part."). In that Montana proceeding, this record reflects that AGSCO and Capital Harvest recovered $196,000, plus interest, on the liens on crops in Montana. Although the district court's March 2004 partial summary judgment limited the lien to supplies or services furnished to the producer within 120 days before the lien was filed and "on produce from the North Dakota lands," the court's January 2006 decision granting final summary judgment does not limit the lien to North Dakota crops. The affidavits of Greg Breuer, Marc Geatz, and Craig Mehling submitted by AGSCO and Capital Harvest in support of the final summary judgment are limited to supplies provided within the 120–day

window, but are not explicitly limited to supplies applied to North Dakota crops. An affidavit by Jim Hardy, however, indicates some of the supplies furnished to Hardy Farm within the 120–day window were applied to crops in Montana. Under our statutes, AGSCO and Capital Harvest are not entitled to an agricultural supplier's lien for supplies applied to crops in Montana, and this record leaves questions of fact as to the appropriate allocation for supplies applied to crops in North Dakota and in Montana. We therefore reverse the judgment on this issue and remand for a determination of the appropriate allocation for supplies applied to crops in North Dakota.

## IX

[¶ 37] Stockman Bank argues the district court erred in allowing AGSCO and Capital Harvest to collect interest on the principal due because the statutes for an agricultural supplier's lien do not specifically provide for the recovery of interest.

[¶ 38] Hardy Farm entered into a revolving charge agreement with AGSCO and its agent, Capital Harvest, under which Hardy Farm agreed to pay a finance charge on payments made after specified dates. The liens by AGSCO and Capital Harvest served as security for Hardy Farm's performance of its obligation to pay for agricultural supplies plus the finance charge. Under these circumstances, we conclude the district court did not err in allowing AGSCO and Capital Harvest to recover the finance charges for late payments.

## X

[¶ 39] Relying on N.D.R.Civ.P. 62(a), Stockman Bank argues the district court erred in failing to require AGSCO and Capital Harvest to return the funds deposited with the court after those funds had been prematurely released by the clerk of court. On this record, we conclude the district court did not err in failing to require return of the funds. However, because we have reversed the judgment in part and remanded for further proceedings, the district court is not precluded from revisiting this issue with regard to that portion of the funds involved in that issue.

## XI

[¶ 40] We affirm the judgment in part, reverse in part, and remand for proceedings consistent with this opinion.

[¶ 41] ROBERT O. WEFALD, D.J., and CAROL RONNING KAPSNER, MARY MUEHLEN MARING and DALE V. SANDSTROM, JJ., concur.

[¶ 42] The Honorable ROBERT O. WEFALD, D.J., sitting in place of CROTHERS, J., disqualified.