# United States Court of Appeals

### For the Eighth Circuit

_____

## No. 23-2249

_____

Continental Resources, Inc., an Oklahoma corporation

*Plaintiff - Appellee*

v.

North Dakota Board of University and School Lands

*Defendant - Appellee*

United States of America

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of North Dakota - Western

_____

Submitted: October 22, 2024
Filed: May 2, 2025

_____

Before SHEPHERD, KELLY, and STRAS, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

The United States appeals the district court's[1] denial of its motion to dismiss for lack of subject matter jurisdiction and grant of summary judgment in favor of the North Dakota Board of University and School Lands (the Land Board) in this interpleader action concerning the entitlement to royalties from minerals extracted from the bed of Lake Sakakawea in North Dakota. The United States also asks this Court to take judicial notice of several documents for the first time on appeal. Having jurisdiction under 28 U.S.C. § 1291, we deny the motion for judicial notice and affirm the judgments of the district court.

I.

North Dakota was admitted into the Union in 1889 and acquired title to the bed of the untamed Missouri River up to the location of the Ordinary High Water Mark (OHWM) from the United States under the equal-footing doctrine. See PPL Mont., LLC v. Montana, 565 U.S. 576, 591 (2012) (describing the equal-footing doctrine). This acquisition included title to the minerals underneath the bed of the River, below the OHWM. See id. at 590. To delineate the boundary between the state-owned riverbed and federally owned lands above the OHWM, the General Land Office, now known as the Bureau of Land Management (BLM), prepared surveys to demarcate the OHWM as it existed at the time of North Dakota's admission to the Union. In the years following North Dakota's admission, the United States patented and conveyed some tracts of land above the OHWM to private landowners.

Decades after the initial determination of the OHWM, Congress passed the Flood Control Act of 1944 to manage the Missouri River Basin, which was prone to flooding. Pub. L. No. 78-534, § 9, 58 Stat. 887, 891 (1944); see also EEE Minerals, LLC v. North Dakota, 81 F.4th 809, 814 (8th Cir. 2023) (describing the Flood Control Act and its aims). This authorized the construction of the Garrison Dam and

---

[1]The Honorable Daniel L. Hovland, United States District Judge for the District of North Dakota.

the creation of Lake Sakakawea on the Missouri River. To construct the Garrison Dam, the United States Army Corps of Engineers (Corps) needed to reacquire some land above the OHWM of the Missouri River that the United States had conveyed to third parties. Thus, the Corps created Segment Maps to identify which lands would need to be reacquired to construct the dam. The Corps Segment Maps used the original BLM surveys as a reference tool and ultimately identified the OHWM as it existed in 1952 before it became fixed within Lake Sakakawea.

Where the United States reacquired privately owned land through voluntary sale, landowners reserved rights to the minerals. Where the United States used the power of eminent domain to reacquire land, it acquired title to the surface *and* mineral estate. Further, some tracts of land above the OHWM under Lake Sakakawea were never conveyed away by the United States after originally being acquired by the United States from France in 1803. Accordingly, the tracts of land now owned by the United States above the OHWM under Lake Sakakawea consist of a patchwork of different tracts of land: some never conveyed away by the United States—"retained lands"—and some "reacquired lands." Additionally, the United States owns the minerals under some, but not all, of these "reacquired lands."

Lake Sakakawea pooled upon completion of the Garrison Dam, after which the OHWM became fixed. Decades later, the Land Board hired a private engineering firm, Bartlett & West, to survey the Missouri River and determine the now-permanent location of the OHWM. The Bartlett & West Survey identifies the OHWM in accordance with North Dakota's guidelines; it did not use the Corps Segment Maps to do so. All of the oil, gas, and other mineral leases currently leased by the Land Board to third parties are made pursuant to the location of the OHWM identified in the Bartlett & West Survey.

Originally, the Land Board claimed "title to the bed of the Missouri River up to the current ordinary high watermark" as to lands that had been sold and reacquired by the United States for construction of the lake. Wilkinson v. Bd. of Univ. & Sch. Lands, 903 N.W.2d 51, 54 (N.D. 2017). In 2017, however, North Dakota enacted

N.D. Cent. Code Chapter 61-33.1 to address the ownership of the bed of the Missouri River and rejected this view, stating that "state sovereign land mineral ownership of the riverbed segments subject to inundation . . . extends only to the *historical* Missouri riverbed channel up to the ordinary high water mark." N.D. Cent. Code § 61-33.1-02 (emphasis added). Additionally, § 61.33.1-03 outlines the process to verify the 1952 Corps Survey's demarcation of the OHWM, providing a comprehensive scheme through which a selected surveying firm would "conduct a review of the [C]orps [S]urvey." N.D. Cent. Code § 61-33.1-03(2). Thereafter, in 2017, the Land Board commissioned Wenck Associates Inc. to determine the location of the OHWM relevant to the acquired lands. See N.D. Cent. Code § 61-33.1-03(2)-(3). The Wenck Survey constitutes the Land Board's official location of the OHWM as relevant to this appeal.

Continental Resources (Continental) is an oil and gas production company that leases minerals from both the Land Board and the United States. In exchange for these leases, the United States and the Land Board have a continuing royalty interest in the minerals extracted by Continental. Continental brought an interpleader action to resolve the United States' and Land Board's competing claims to over 3.5 million dollars in royalty proceeds, as entitlement depends on the location of the OHWM. In plain terms, if North Dakota law and the state survey govern the location of the OHWM, the Land Board is entitled to a larger percentage of the royalties; conversely, if the federal survey controls, the United States is entitled to a larger percentage of the royalties. Finally, Continental has never been delinquent on payments to either party and does not claim title to any of the proceeds.

After Continental initiated this interpleader action in state court, the United States removed the action to federal court and moved to dismiss based on sovereign immunity. The district court denied the motion, holding that under 28 U.S.C. § 2410(a)(5), the United States expressly waived sovereign immunity in this action because North Dakota law created a lien in favor of the United States immediately upon Continental severing the leased minerals from the land. The case proceeded on the merits, and the parties filed cross-motions for summary judgment. The

-4-

district court granted summary judgment in favor of the United States on its motion concerning the lands retained by the United States since admission of North Dakota to the Union, finding that federal law and the Corps Survey governed the location of the OHWM.[2] The district court then granted summary judgment in favor of the Land Board on its motion concerning the lands conveyed away but later reacquired by the United States, finding that North Dakota law and the Wenck survey governed the location of the OHWM as to those lands. The United States now appeals the grant of summary judgment in favor of the Land Board.

## II.

The United States first challenges the district court's denial of its motion to dismiss for lack of subject matter jurisdiction based on sovereign immunity. "[W]e have jurisdiction to review the denial of sovereign immunity and do so *de novo*." Myers v. Iowa Bd. of Regents, 30 F.4th 705, 707 (8th Cir. 2022).

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 287 (1983). However, Congress has explicitly waived the United States' sovereign immunity "in any civil action . . . in any [s]tate court having jurisdiction of the subject matter . . . of interpleader . . . with respect to[] real or personal property on which the United States has or claims a mortgage or other lien." 28 U.S.C. § 2410(a)(5). As Continental originally brought this interpleader action in North Dakota state court, the only issue we must address is whether the United States has a lien on the disputed royalties under North Dakota law within the meaning of § 2410(a)(5).

North Dakota has a comprehensive statutory lien scheme. See N.D. Cent. Code § 35-01-01 et seq. Relevant here, N.D. Cent. Code § 35-37-02(1) states:

---

[2]North Dakota initially filed a cross-appeal on this ruling but later withdrew it. Hence, this opinion solely decides what law demarcates the OHWM on the lands that were reacquired by the United States.

To secure payment from the sale of oil or gas, an interest owner . . . has a continuing security interest in and a lien on the oil or gas severed, or the proceeds of sale if the oil or gas has been sold, to the extent of the interest owner's interest until the purchase price has been paid to the interest owner.

"When interpreting a statute, we look to its plain language and give words their 'ordinary, contemporary, common meaning' unless they are otherwise defined in the statute itself." Hennepin County v. Fed. Nat'l Mortg. Ass'n, 742 F.3d 818, 821 (8th Cir. 2014) (citations omitted); see Stockman Bank of Mont. v. AGSCO, Inc., 728 N.W.2d 142, 149-50 (N.D. 2007) ("Words in a statute are given their plain, ordinary, and commonly understood meaning . . . ."). In so doing, we must read N.D. Cent. Code § 35-37-02 "in [its] context and with a view to [its] place in the overall statutory scheme." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) (citation omitted); see also In re Est. of Thompson, 586 N.W.2d 847, 849 (N.D. 1998) ("We construe statutes as a whole to give effect to each of [their] provisions . . . ."). As stated by the district court, the plain meaning of N.D. Cent. Code § 35-37-02(1) in conjunction with 28 U.S.C. § 2410(a)(5) indicates that "if the United States owns minerals in North Dakota, it has a continuing state-law lien on proceeds derived from those minerals until the lien is satisfied. . . . Because the United States claims an interest in the [d]isputed [m]inerals, it cannot argue it does not have or claim a lien on unpaid royalties produced from those minerals."

The United States makes several additional arguments in favor of sovereign immunity, none of which have merit. First, the United States claims there was no lien in existence at the time the interpleader action was filed because the act secured by the lien was the payment of royalties; thus, because Continental was never delinquent in its royalty payments, no lien existed. The United States seizes on N.D. Cent. Code § 35-01-04, a general provision under the North Dakota lien scheme, which states that "[n]o lien arises by operation of law until the time at which the act secured by the lien is to be performed." However, a basic canon of statutory construction is "that the specific governs the general." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992). The North Dakota statutory scheme

-6-

acknowledges this canon in N.D. Cent. Code § 35-01-01, which states that the "general statutes relating to liens apply to all liens . . . unless from the context relating to any of them a different intention appears." Because N.D. Cent. Code § 35-37-02(1) contains a specific provision acknowledging that an interest holder has "a lien on the oil or gas severed" even *before* payment becomes due, this provision overrides the general principle set forth in § 35-01-01. Once Continental severed the minerals from the bed of Lake Sakakawea, which it continues to do, the United States had, and continues to have, a lien on those minerals, regardless of whether an obligation to pay had accrued.

Second, the United States claims that § 2410(a)(5) limits a waiver of sovereign immunity to "disputes over the priority of liens and disputes concerning the procedural validity of the liens." Appellant Br. 28-31. The United States undertakes a lengthy legislative history analysis to support this argument, but "we do not resort to legislative history to cloud a statutory text that is clear." Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994); see also Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz, 601 U.S. 42, 58 (2024) ("[I]t is error to grant sovereign immunity based on inferences from legislative history in the face of clear statutory direction waiving that immunity."). Section 2410(a) contains no language that limits a waiver of sovereign immunity to priority or validity disputes, and we decline to read such a limitation into clear statutory language. Finally, the United States argues that allowing a waiver of sovereign immunity in this case would "work an end-run" around the Quiet Title Act (QTA). Appellant Br. 31. This argument is belied by the text of the QTA itself, which states that it "does not apply to . . . or affect actions which may be or could have been brought under section[] . . . 2410 of this title." 28 U.S.C. § 2409a(a). This action, brought under § 2410(a)(5), fits squarely within the exception to the QTA.[3]

---

[3]Moreover, "Congress intended the QTA to provide the exclusive means by which *adverse* claimants could challenge the United States' title to real property." Block, 461 U.S. at 286 (emphasis added). Continental is not an "adverse claimant" to the United States—in fact, it asserts no hostile claim at all as it claims no title to the royalties. See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v.

Because the United States claims a lien on the disputed minerals that are the subject of this interpleader action, the district court properly denied the motion to dismiss for lack of subject matter jurisdiction under the provision of 28 U.S.C. § 2410(a)(5).

III.

The United States next challenges the grant of summary judgment in favor of the Land Board. "This Court reviews the district court's grant of summary judgment de novo." Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs., 558 F.3d 731, 734 (8th Cir. 2009). On review, "the nonmoving party is given the benefit of all reasonable inferences." Estate of Morgan v. Cook, 686 F.3d 494, 496 (8th Cir. 2012) (citation omitted).

In 1889, the equal-footing doctrine granted North Dakota "[u]pon statehood . . . title within its borders to the beds of waters then navigable," allowing it to "allocate and govern those lands according to state law." PPL Mont., 565 U.S. at 591. This title was "conferred not by Congress but by the Constitution itself." Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co., 429 U.S. 363, 374 (1977); see also Pollard v. Hagan, 44 U.S. (3 How.) 212, 223 (1845) (interpreting U.S. Const. art. IV, § 3, cl. 1). Thus, the initial determination of the OHWM, which set the boundary between the state-owned riverbed and federally owned uplands, was originally determined by federal law. See Corvallis, 429 U.S. at 376. The question presented today, however, is whether federal law continues to define the OHWM.

---

Patchak, 567 U.S. 209, 219-20 (2012) (defining "adverse claimants" as "plaintiffs who themselves assert a claim to property antagonistic to the Federal Government's"). Continental does not claim an interest in the disputed royalties, and the QTA does not bar suit. See id. at 221-22 (rejecting the dissenter's view that the QTA "encompasses all actions contesting the Government's legal interest in land, regardless whether the plaintiff claims ownership himself").

In Corvallis, the Supreme Court explained that "federal law . . . fix[es] the initial boundary line between [up]lands and the riverbeds at the time of a State's admission to the Union." Id. at 370. "But that determination is solely for the purpose of fixing the boundaries of the riverbed acquired by the State at the time of its admission . . . ; thereafter the role of the equal-footing doctrine is ended, and the land is subject to the laws of the State." Id. at 376. "[S]ubsequent changes in the contour of the land, as well as subsequent transfers of the land, are governed by the state law." Id. at 377 (citing Joy v. St. Louis, 201 U.S. 332, 343 (1906)). The generally applicable principal that "state law governs issues relating to . . . property" yields only if "some other principle of federal law requires a different result." Id. at 378. For example, if "the United States has never yielded title or terminated its interest" in the land at issue, federal law controls. Wilson v. Omaha Indian Tribe, 442 U.S. 653, 670 (1979). Otherwise, the rule stands that "lands . . . having passed from the Federal Government are subject to the laws of the State in which they lie." Corvallis, 429 U.S. at 377. In sum, if the United States yielded title to the uplands above the OHWM and the OHWM has moved since the admission of North Dakota into the Union, North Dakota law governs the current location of the OHWM.

Here, it is undisputed that the United States relinquished title to the lands at issue by conveyance to third parties and then had to reacquire them under eminent domain or purchase in order to construct the Garrison Dam and Lake Sakakawea. Based on Corvallis, the district court correctly concluded state law applies to determine the current location of the OHWM as to such reacquired lands.

The United States argues that U.S. Const. art. IV, § 3, cl. 2—the Property Clause—is "some other principle of federal law" that requires this Court to apply federal common law to determine the location of the OHWM. It asserts that United States v. Oregon so held. See 295 U.S. 1 (1935). However, the Court in Oregon answered the question of whether the several bodies of water "involved underlay navigable waters *at the time of the admission* of Oregon to statehood." Id. at 6 (emphasis added). The lands in Oregon "remain[ed] the property of the United States[;]" thus, a state could not "affect the title . . . [with] legislative

-9-

pronouncements." Id. at 29.  In sum, Oregon dealt with the question of what law to apply when the original intent of a conveyance by the United States to a State was at issue, not how to determine the current property boundaries *after* the United States has yielded title.  See id. at 28 ("[H]ere . . . there is no basis for implying any intention to convey title to the state.").  Additionally, "[t]he Property Clause itself does not automatically conflict with all state regulation of federal land."  Cal. Coastal Comm'n v. Granite Rock Co., 480 U.S. 572, 580 (1987).  The United States claims that its "status as the property owner [above] the OHWM is sufficient to resolve this suit,"[4] see Appellant Br. at 44, but that proposition is belied by both Corvallis and Granite Rock.  The United States points to no other principle of federal law that would prohibit the Land Board from defining the OHWM according to state law.

Likewise, the dissent's piecemeal citation to Oregon fares no better. Our opinion has no bearing on whether federal law governs the "disposition of title to [the United States'] lands" that were *never relinquished* by the United States, the exact factual context of Oregon. 295 U.S. at 27.  Oregon does not control when it is undisputed, as here, that the lands were voluntarily conveyed away and later reacquired by the United States.  While the dissent claims that "[i]t makes no difference when or how the United States acquired the land,"[5] post, at 15-16, this assertion runs headlong into Corvallis, which the dissent conveniently ignores. Corvallis commands that "lands . . . having passed from the Federal Government are

---

[4]The United States' citation to Borax Consolidated v. Los Angeles is inapposite for similar reasons.  See 296 U.S. 10, 22 (1935) (noting that the question concerned the "extent of [the] federal grant," thereby implicating the Property Clause).  Moreover, the Corvallis Court specifically stated that Borax should not be "read so expansively."  429 U.S. at 382.

[5]The Supreme Court has already heard and overruled this argument before. See Corvallis, 429 U.S. at 371 (holding that it was erroneous to "view the equal-footing doctrine . . . as a basis upon which federal common law could supersede state law in the determination of land titles," overruling Bonelli Cattle Co. v. Arizona, 414 U.S. 313 (1973)).

-10-

subject to the laws of the State in which they lie." 429 U.S. at 377. Because Corvallis "has a direct application" in this case, we are bound to follow it and must "leav[e] to th[e Supreme] Court the prerogative of overruling its own decisions" should the Court so choose. Mallory v. Norfolk S. Ry. Co., 600 U.S. 122, 136 (2023) (citation omitted).

The dissent next asserts that the Supremacy Clause is "some other principle of federal law [that] requires a different result." See Corvallis, 429 U.S. at 378; post, at 15 (citing U.S. Const. art. VI, cl. 2). While it is true that the "United States is no ordinary landowner," post, at 15, the Supremacy Clause does not give the United States carte blanche to determine property boundaries on land it *voluntarily* relinquished title to and later reacquired. Each case cited by the dissent is factually distinct from this one: no case analyzes what law governs the determination of a property line in context of lands relinquished and subsequently reacquired by the United States.[6] That distinction matters; therefore, these cases have no bearing on our analysis.[7]

---

[6]In fact, most of these cases analyze the ability of a state to regulate property which *undisputedly* belongs to the federal government. See Hancock v. Train, 426 U.S. 167, 179 (1976) (holding that Kentucky could not impose *more* requirements on the federal government than those required by the EPA because a state may not regulate a federal installation or activity absent "a clear congressional mandate"); Kleppe v. New Mexico, 426 U.S. 529, 538-39 (1976) (holding that Congress has the power to determine "'needful' rules 'respecting' the public lands" which are undisputedly Congress's "own property"); Arizona v. Bowsher, 935 F.2d 332, 333 (D.C. Cir. 1991) (analyzing whether states could assume custody of "money that federal agencies owe[d] to American citizens whose whereabouts [were] unknown" when federal law authorized only the Secretary of the Treasury to do so). This appeal addresses what land was actually *owned* by the United States, not the question these cases present of what was *done* with the land.

[7]We also note that the dissent's concern that North Dakota's law will not allow the United States "to win some and lose some" is completely unfounded in this case. Post, at 16. The United States received a favorable summary judgment ruling on the other half of this action. Thus, it "w[o]n some," the un-appealed half of this suit, and "los[t] some," this appeal.

In sum, once the United States ceded title to the lands it had retained under the equal-footing doctrine, the location of the OHWM became "subject to the laws of the State in which [it lay]": North Dakota. Corvallis, 429 U.S. at 377. The district court correctly concluded that the current location of the OHWM must be determined in accordance with North Dakota law.[8] Under North Dakota law, the Wenck survey commissioned pursuant to N.D. Cent. Code § 61-33.1-03 governs the location of the OHWM. Therefore, the district court properly granted summary judgment in favor of North Dakota.

IV.

Finally, the United States asks this Court to take judicial notice of over 80 pages from various documents for the first time on appeal. While "[a]n appellate court may take judicial notice of a fact for the first time on appeal," we decline to do so here. See Gustafson v. Cornelius Co., 724 F.2d 75, 79 (8th Cir. 1983). Judicial notice can be taken "as long as it is not unfair to a party to do so and does not undermine the trial court's factfinding authority." United States v. Jones, 574 F.3d 546, 551 n.2 (8th Cir. 2009) (citation omitted). This consideration stems from the "respect for the adversarial process," as utilizing judicial notice does not allow the information to be "'tested in the crucible' of litigation." 1-800-411-Pain Referral Serv., LLC v. Otto, 744 F.3d 1045, 1063 n.13 (8th Cir. 2014) (citation omitted).

We see no reason to depart from the traditional rule that "[a]n appellate court can properly consider only the record and facts before the district court," Bath Junkie Branson, LLC v. Bath Junkie, Inc., 528 F.3d 556, 559 (8th Cir. 2008) (citation omitted), because "we are a court of 'review, . . . not first view,'" United States v. Nunez-Hernandez, 43 F.4th 857, 859 (8th Cir. 2022) (alteration in original) (citation omitted). To do so would be "unfair," as it would allow the United States to create a new record on appeal with "evidence which [the district court] had no opportunity

_____

[8]Because Corvallis governs our analysis, we do not address the district court's alternative holding that, even if federal law governed, the Wilson factors weigh in favor of adopting North Dakota law as the rule of decision. See 442 U.S. at 653.

to consider" and sandbag the Land Board.  See Minn. Fed'n of Tchrs. v. Randall, 891 F.2d 1354, 1359 n.9 (8th Cir. 1989).  The United States had ample opportunity to present these documents and related arguments before the district court—its failure to do so is not an error we will correct on appeal.

## V.

For the foregoing reasons, the judgment of the district court is affirmed, and the United States' motion for judicial notice is denied.

STRAS, Circuit Judge, dissenting in part.

States cannot take land from the United States without its consent.  *See United States v. Oregon*, 295 U.S. 1, 27–28 (1935).  North Dakota effectively did so here, so I respectfully dissent from the court's decision letting it happen.

## I.

The disputed lands have a complicated history.  They belonged to the United States before North Dakota's admission to the Union.  Once it was granted statehood in 1889, North Dakota gained ownership of the Missouri riverbed under the equal-footing doctrine, with the United States "retain[ing] . . . title" to the land outside it. *PPL Mont., LLC v. Montana*, 565 U.S. 576, 591 (2012).

Over the next several decades, the United States gave away or sold some of what it owned to private parties and North Dakota.  Then Congress decided to build the Garrison Dam in 1944, which created Lake Sakakawea after it became operational.  Nobody wanted to own land submerged under a lake, so the United States bought up as much as possible and acquired the rest through eminent domain. The only part it did not need was the area below the high-water mark of the Missouri River, which was already underwater and belonged to North Dakota.

According to basic property-law principles, ownership rights today depend on what the United States received in the 1940s. *See Sibert v. Kubas*, 357 N.W.2d 495, 497 (N.D. 1984) (measuring what was transferred "at the time of the conveyance"). The high-water mark of the Missouri River was the dividing line: North Dakota kept what was below it and the United States reacquired what was beyond it. *See The Idaho*, 93 U.S. 575, 580 (1876) (recognizing that a landowner "cannot confer rights which he does not himself possess").

The location of the high-water mark, however, has been the subject of debate. Rivers move, and ownership can move with them. *See Wilson v. Omaha Indian Tribe*, 442 U.S. 653, 673 (1979) (noting that "changes in the course of a river" can affect "land own[ership]"). While the land was in private hands, it was "subject to the laws of" North Dakota. *Oregon ex rel. State Land Bd. v. Corvallis Sand & Gravel Co.*, 429 U.S. 363, 377 (1977); *see Norby v. Est. of Kuykendall*, 869 N.W.2d 405, 408–09 (N.D. 2015) (describing North Dakota law on how river movements affect ownership). Once the United States built the dam and flooded the area, however, it was under water. A submerged river can no longer move, so state law had no role to play anymore. *See Wilson*, 442 U.S. at 676 (observing that federal law incorporates state law about river movement). Ownership became fixed, which meant that North Dakota still owned whatever it had in 1953, when the area was flooded, and the United States owned what it acquired to build the dam.

Nothing changed for the next 64 years, until 2017, when North Dakota decided to grab more of the royalties from the newly accessible natural gas located beneath the lakebed. State legislation authorized a new survey of the area, which showed that North Dakota owned more than everyone thought. *See* N.D. Cent. Code § 61-33.1-03(2)–(3). More land meant more royalties. And, according to the legislation, the new survey trumped the ones that the Army Corps of Engineers had done in the 1950s. *See id.*

North Dakota's legislative declaration left the United States with few options. If the law was valid, it could not challenge the factual determinations in federal court.

*See id.* § 61-33.1-05 (limiting judicial review to a *state*-court action with a two-year statute of limitations).  Nor could it argue that the Corps of Engineers surveys were a more accurate reflection of what it acquired in the 1940s.  *See id.* (requiring the protesting party to prove any error in the North Dakota survey "by clear and convincing . . . evidence of the type" declared in the statute); *id.* § 61-33.1-06 (exempting the United States only for lands it never gave away, but not for lands it repurchased).  In effect, the statute proclaimed, by "[l]egislative fiat," what North Dakota owned, then and today.  *W. & Atl. R.R. v. Henderson*, 279 U.S. 639, 642 (1929).

## II.

The court blesses what it did.  In its view, once the United States acquired the land to build the Garrison Dam, it was subject to North Dakota property law, including the 2017 statute, just like any other landowner.  *See Corvallis*, 429 U.S. at 377–78 (applying "state law," rather than the "equal-footing doctrine," to lands that had both "passed" to *and remained with* private landowners).  As straightforward as the court's approach may sound, it misses an important point.  The United States is no ordinary landowner, thanks to the Supremacy Clause.  *See* U.S. Const. art. VI, cl. 2; *Kleppe v. New Mexico*, 426 U.S. 529, 543 (1976) (recognizing that "under the Supremacy Clause[,] . . . the public domain of the United States" can never be "completely at the mercy of state legislation" (citation omitted)); *Hancock v. Train*, 426 U.S. 167, 179 (1976) (noting that the Supremacy Clause protects the federal government from "regulation by a subordinate sovereign").

Federal law, in other words, still matters.  As the Supreme Court has explained, "[t]he laws of the United States alone control the disposition of *title* to its lands," which leaves states "powerless to place any limitation or restriction" on what the federal government owns.  *Oregon*, 295 U.S. at 27–28 (emphasis added); *see Arizona v. Bowsher*, 935 F.2d 332, 334 (D.C. Cir. 1991) (recognizing that "the Supremacy Clause does not permit" states to "subordinate federal property to their own laws and appropriate that property . . . for themselves").  It makes no difference

when or how the United States acquired the land, whether it always owned it or seized or purchased it later.[9]  Either way, states only have "concurrent . . . authority" over it, not the *unilateral* ability to redraw its boundaries.[10]  *Kleppe*, 426 U.S. at 542.

General and neutrally applicable state laws can still play a role, but only because the federal common law incorporates them.  *See Wilson*, 442 U.S. at 673 (recognizing that state rules that apply "evenhandedly to particular disputes" pose "little likelihood of injury to federal" interests in the long run).  That is, laws that allow the United States to win some and lose some, depending on the circumstances.  *See id.* (explaining that state law takes a backseat when there is "concrete evidence that adopting it *would* adversely affect federal interests" (quoting *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 730 (1979) (emphasis added))).  An example would be the accretion and avulsion laws that many states, including North Dakota, have.  *See, e.g.*, *Norby*, 869 N.W.2d at 408–09.

The 2017 North Dakota law, on the other hand, is the opposite of general and neutrally applicable.  It covers one specific riverbed, meaning it cannot apply "evenhandedly" over multiple "occasions."  *Wilson*, 442 U.S. at 673; *cf. St. Louis-*

---

[9]The problem with relying on *Corvallis* is that it dealt with whether a *private party* who had received land from the federal government continued to hold rights under the equal-footing doctrine.  *See* 429 U.S. at 371 (holding that "[t]he equal-footing doctrine d[oes] not . . . provide a basis for federal law to supersede [a] [s]tate's application of its own law in deciding title to" *private land*).  It was no surprise that the answer was no, but the United States does not need to rely on the equal-footing doctrine to maintain supremacy over title to its own land.  *See Oregon*, 295 U.S. at 27–28.  That is, the distinction between originally owned and later-acquired federal land may matter under the equal-footing doctrine, but not here, when it is no longer in play.

[10]For example, states are "free to enforce [their] criminal and civil laws on federal land *so long as those laws do not conflict with federal law*."  *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 580 (1987) (emphasis added) (citation omitted); *see Kleppe*, 426 U.S. at 542.  But *regulating* what happens *on* federal land is a far cry from *taking* some of it.

*S.F. Ry. Co. v. Bledsoe*, 7 F.2d 364, 367 (8th Cir. 1925) (discussing the "evils of special legislation").  It also favors North Dakota by requiring the United States to come up with "clear and convincing evidence" showing the survey's results were wrong, despite the difficulty in doing so with a river that has spent decades submerged.  N.D. Cent. Code § 61-33.1-05; *see St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 51–52 (1936) (concluding that a legislature's "declaration[s] or finding[s] [must] necessarily [be] subject to independent judicial review . . . to the end that the Constitution as the supreme law of the land may be maintained"); *W. & Atl. R.R.*, 279 U.S. at 642.

### III.

The United States did not "assent," *Oregon*, 295 U.S. at 27, impliedly or otherwise, to having its ownership interests "subordinate[d]" to North Dakota's after-the-fact declarations, *Hancock*, 426 U.S. at 179.  Under the federal common law, the 2017 statute should have had *no legal effect* at all on what the United States owns.  Who owns what is for a court, not the State of North Dakota, to decide on a level playing field.  *See Burlington N. R.R. Co. v. Bair*, 766 F.2d 1222, 1226 (8th Cir. 1985) (requiring a district court to "rely on actual evidence[,] rather than a statutory definition," when it "make[s] factual findings").

_____